## Hale's Estate.

*Bailment—Wrongful pledge of stock—Purchaser without notice.*

1. A *bona fide* purchaser of stock for value, without notice that such stock had been wrongfully taken by the vendor or pledgor from the true owner, is entitled to hold the stock as against the owner, whose loose business methods made possible the transfer of the stock.

2. The rule that a pledgee who takes stock as a mere security for a pre-existing debt is not a purchaser for value has no application when a new consideration is given.

Exceptions to adjudication. O. C. Phila. Co., Oct. T., 1922, No. 492.

The facts appear by the adjudication of the auditing judge (Gest, J.), which was, in part, as follows:

"Mr. Kaufman, on behalf of Lou D. Shurtleff, presented her claim for the proceeds of sale of 133 shares of preferred stock voting trust certificates of Hale and Kilburn Corporation, alleged to belong to the claimant, and voluminous testimony was taken. The facts appear to be as follows: Henry S. Hale, who was a brother of J. Warren Hale, deceased (the decedent), gave his two promissory notes to Lou D. Shurtleff, one dated Dec. 9, 1910, for $10,000, payable five years after date, and one for $7500, dated April 17, 1913, payable in one year, and assigned to her as collateral security therefor two certificates for 100 shares each of the preferred stock of Hale and Kilburn Company, a corporation, numbered P 213 and P 214. In 1918 the corporation was reorganized, which necessitated the surrender of the certificates and their exchange for new securities, so, on Jan. 6, 1918, Henry S. Hale requested Miss Shurtleff to send the certificates to the Bankers Trust Company of New York, which acted as depositary of the reorganization. Miss Shurtleff, through Mr. Charles Bush, who acted for her, got the stock from her safe deposit box and gave it to Henry S. Hale, who surrendered it, and received in lieu thereof voting trust certificates, 106 for 100 shares and 107 for 33 shares of preferred stock of Hale and Kilburn Corporation, this being according to the basis of exchange, viz.: Two shares of the new preferred stock for three shares of the old preferred stock. These new voting trust certificates, dated Feb. 28, 1918, were issued by the Bankers Trust Company in the name of Henry S. Hale, and it was his duty to give them, with a proper power of attorney, to Miss Shurtleff, which, however, he did not do. On the contrary, he added 146 other shares of his own and procured two certificates for 100 shares each and one for 79 shares, which were issued to him in his own name. Before this time Henry S. Hale had sustained serious financial losses. He had acquired certain property at Dixville Notch, New Hampshire, and had there constructed at enormous expense, said to be about $3,000,000, an elaborate summer hotel and resort known as The Balsams, which he conducted in his own name, or that of the Dixville Notch Corporation, which, as a corporation, did not exist. The enterprise was a failure, and his creditors were pressing him, so that he was obliged to transfer the hotel property and certain securities to a creditors' committee, representing banks holding notes made by him in his own name or that of the Dixville Notch Corporation. Among these securities were the 279 shares of the Hale and Kilburn preferred stock above mentioned, which included the 133 shares received by him in exchange for the old 200 shares which had been held by Lou D. Shurtleff as collateral for the debt. On July 12, 1918, Henry S. Hale, J. Warren Hale and the creditors' committee made a written contract, reciting that the committee had caused a new corporation to be formed, styled the Dixville Notch Corporation, to which the committee had assigned the securities received from Henry S. Hale, and J. Warren Hale agreed to purchase, and did purchase

from the holders thereof, Henry S. Hale's unsecured notes at 75 per cent. of their face value, and also agreed to pay the expenses of the committee and all other trade and other indebtedness of Henry S. Hale or the Dixville Notch Corporation, and the committee agreed on the receipt of the consideration as specified to assign and transfer to J. Warren Hale the shares of the capital stock of the Dixville Notch Corporation and all cash, securities and property of every sort in the hands of the committee belonging to Henry S. Hale. The amount paid by J. Warren Hale to the committee for the notes under this agreement was $591,375. In the schedule of the securities annexed to the agreement there appear 279 shares of the Hale and Kilburn Corporation preferred in the name of Henry S. Hale, and these, with all the others, passed into the possession of J. Warren Hale, and were used by him as his own. The 279 shares of Hale and Kilburn preferred were sold by him in his lifetime, in May, 1919, for $16,865.99, and according to the schedule agreed to by counsel for the estate and for Lou D. Shurtleff, the total value received by J. Warren Hale in his lifetime, or by his executors after his death, including proceeds of the securities of the Dixville Notch Corporation, in liquidation, and the value of certain securities, which remain *in specie* in their hands, aggregated $300,262.01.

"J. Warren Hale came to the assistance of his brother, Henry S. Hale, in another transaction. The latter had borrowed large sums from the Land Title and Trust Company, the Girard Trust Company and the Pennsylvania Company for Insurances on Lives, etc., which were consolidated into one account with the Pennsylvania Company, for which he had deposited as collateral numerous securities, the indebtedness aggregating some $448,000, in his own name and other notes of the Dixville Notch Corporation, amounting to $75,000. By agreement dated Jan. 23, 1918, Henry S. Hale agreed to transfer the stock, deposited as collateral, to J. Warren Hale, who agreed to execute to the Pennsylvania Company such evidence of indebtedness as it might require in the sum of $523,000, this being the sum of the debts above mentioned of $448,000 and $75,000, and to deposit additional collateral not exceeding $100,000 to make the security adequate. The agreement provided that J. Warren Hale, after paying the Pennsylvania Company, might apply both the income and the principal of the collateral to a debt due by Henry S. Hale to his wife, Frances E. Hale, in the sum of $100,000, the debt due to Lou D. Shurtleff of $17,500, a debt due to Helen Hale Rasmus of $25,000, and a debt due H. Warren K. Hale of $25,000. The testimony showed that J. Warren Hale, who received the income from the collateral, paid the same into the account of the Pennsylvania Company known as J. Warren Hale Special, and Hale from time to time drew checks thereon, including payments to Miss Shurtleff of the interest on Henry S. Hale's notes, which she held, and took her receipt therefor. The testimony of the trust officer of the Pennsylvania Trust Company was to the effect that all equities of Henry S. Hale's loans in this transaction went into this agreement of Jan. 23, 1918, but did not go into the estate of J. Warren Hale.

"It was claimed on behalf of Miss Shurtleff that J. Warren Hale acquired the said 133 shares of Hale and Kilburn with notice of her title thereto as pledgor, and that she was, therefore, entitled to the proceeds thereto, presumably 133-279ths of $16,866, received by J. Warren Hale when he sold the 279 shares.

"I have considered the testimony with care, but fail to find anything therein showing that J. Warren Hale took over this stock with any notice of Miss

3 D. & C.

### Hale's Estate.

Shurtleff's title or anything from which such a fact might be inferred. There certainly was nothing on the face of the certificates to put him on notice, nor was there any testimony to show that he knew the fact. The testimony only goes to the extent of showing that J. Warren Hale knew that Miss Shurtleff held his brother's notes, but it does not show, and there is nothing in the correspondence to show, that J. Warren Hale knew that Henry S. Hale had given him collateral that really belonged to Miss Shurtleff. The law on the subject is clear. J. Warren Hale was a purchaser for value without notice, as appears from the express provisions of the Uniform Stock Transfer Act of May 5, 1911, P. L. 126, and, even if the transaction be viewed from the standpoint that a pledgee who takes stock as a mere security for a pre-existing debt is not a purchaser for value, this rule does not hold (irrespective of the said act of assembly) when a new consideration is given, as it certainly was in this case, for J. Warren Hale paid $591,375 when he took the stock.

"Not only was the burden of proof on the claimant (1 Daniel Nego. Inst. (6th ed.), § 5819; Battles v. Laudenslager, 84 Pa. 446), but the principle applies that Miss Shurtleff, by handing over the certificates to Henry S. Hale, invested him with apparent ownership, and it is just that the loss caused by his fraudulent act should fall upon her rather than on the transferee without notice: Little v. Fearon, 252 Pa. 430; Colonial Trust Co. v. Central Trust Co., 243 Pa. 268; King v. Mellon Bank, 227 Pa. 22; Shattuck v. Cement Co., 205 Pa. 197. The claim of Lou D. Shurtleff is dismissed." . . .

*John G. Kaufman,* for exceptant.

*Henry, Pepper, Bodine & Stokes,* contra.

LAMORELLE, P. J., April 27, 1923.—Whichever rule we apply, the result is the same. If one of two innocent parties must suffer, then the loss must fall upon the claimant, Lou D. Shurtleff, because she was negligent in delivering the securities to her debtor for the purpose of having them exchanged for new shares of stock. If, on the other hand, the decedent bought from the committee of creditors his brother's loans, taking over the collateral then with the loans without knowledge that his brother, the debtor of Lou D. Shurtleff, had obtained these shares of stock for another purpose, the claimant has no equity to compel his estate to refund and make good the loss.

The claimant was unable to show knowledge in the decedent, though wide latitude was given her as a witness. The fact that the decedent paid her interest on the loans is not helpful. The notes themselves were ordinary promissory notes, and did not call for collateral; in fact, the certificates which at one time the claimant had were issued and dated some years after the giving of the notes themselves, which would imply that the loans were not made on the collateral at all, but on the simple promise of the debtor. At no time were the exchanged shares of stock in any name other than that of the debtor (until Sept. 24, 1918, when they were transferred to J. Warren Hale following his purchase of his brother's loans from the committee of creditors), and there was nothing to put any one dealing with him on notice.

An exhaustive examination of the record demonstrates that the auditing judge was correct in his findings of fact, his deductions from these facts and in his application of the law. The cases cited support his ruling, and those referred to by the exceptant are not in point in view of the facts as found.

We see no reason to add anything more, except to say that there is a fund held in trust, among other things, to pay the claimant the principal and inter-

est of her notes, so that it is possible she will not lose anything because of the misconduct of her agent in failing to return to her the collateral.

Accordingly, all exceptions are dismissed and the adjudication is confirmed absolutely.